# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

C.J. MOZZOCHI,

  *Plaintiff*,

  v.                                                      No. 3:21-cv-01159 (MPS)

TOWN OF GLASTONBURY,

  *Defendant*.

## RULING ON MOTION TO DISMISS

### I.      INTRODUCTION

Plaintiff C.J. Mozzochi ("Mozzochi"), a business owner in and resident of the Town of Glastonbury (the "Town"), filed this action against the Town alleging a violation of the Equal Protection Clause.  Mozzochi's claim arises out of interactions between Mozzochi and the Glastonbury Police Department that took place in 2019 and 2020.  *See* ECF No. 19.  The Town moved to dismiss the operative Amended Complaint (ECF No. 19) under Fed. R. Civ. P. 12(b)(6).  ECF No. 23.  In its motion, the Town primarily contends that Mozzochi failed to state a claim for relief under the Equal Protection Clause because his complaint "fails to identify any similarly situated comparators under either the selective enforcement or class of one theories [*sic*]" of an equal protection claim.  ECF No. 23-1 at 12.   As explained below, the Court disagrees and finds that Mozzochi has plausibly stated a claim for relief.  Accordingly, the Town's motion to dismiss is denied.

### II.      BACKGROUND

1

a. *Factual Allegations*[1]

Mozzochi, a "life-long resident of the Town of Glastonbury," ECF No. 19 (Amended Complaint) at ¶ 3, is "an owner of commercial real estate in Glastonbury." *Id.* at ¶ 5. The office Mozzochi maintains in Glastonbury is located in "a high-crime area of the town." *Id.*

According to Mozzochi's complaint, on December 1, 2020, an unknown individual "began banging and pounding on the door and windows of the plaintiff's street-level office, terrifying the plaintiff." *Id.* at ¶ 5. One of the tenants in his building later informed Mozzochi that the unknown individual was an employee of Eversource. *Id.* At some point after the incident, Mozzochi contacted Eversource "in an attempt to ascertain the perpetrator's identity and the reason for his actions." *Id.* He received no information from Eversource, so on January 21, 2021, Mozzochi filed a written complaint with the Glastonbury Police Department concerning the incident. *Id.*

In his complaint to the police department, Mozzochi "alleg[ed] that the conduct in question constituted apparent violations of several provisions of the criminal statutes of the state." *Id.* Marshall Porter, the Chief of the Glastonbury Police Department, handled Mozzochi's complaint. *Id.* In conducting his investigation, Chief Porter spoke with an Eversource representative, but did not contact Mozzochi or otherwise attempt to "ascertain the identity of the perpetrator." *Id.* Chief Porter closed Mozzochi's case file "on the basis that in his opinion no criminal offense had taken place." *Id.*

This experience, the complaint alleges, stands in stark contrast to two other encounters Mozzochi had with the Glastonbury Police. *See id.* at ¶ 6.

---

[1] The Court accepts the following facts, taken from the Amended Complaint (ECF No. 19), as true for purposes of this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

First, Mozzochi alleges that on June 29, 2019, while he was in his office "engaged in an important business transaction," Glastonbury Police Officer Hemingway entered his office and interrupted with a report that one of Mozzochi's tenants "had complained to the police that [Mozzochi] had posted on his window photographs of lease violations being committed by the tenant." *Id.* at ¶ 6. Officer Hemingway remained in Mozzochi's office for twenty minutes, "harassing him with accusations and interrogation despite [Mozzochi's] repeated demands that [the officer] leave." *Id.* Mozzochi wrote to Chief Porter later that day to complain about the officer's conduct. *Id.* Chief Porter responded to Mozzochi on September 16, 2019 in a letter stating that "all of the plaintiff's allegations were false and that his complaint was 'unfounded.'" *Id.* Chief Porter's letter to Mozzochi further stated that "the manner in which the unfounded [June 2019] complaint *against* the plaintiff was handled was the proper way to handle an unfounded complaint." *Id.* at ¶ 7 (emphasis in original).

Second, the complaint alleges that "[o]n an afternoon in early March of 2020," Mozzochi noticed a vehicle "parked on the street in front of his commercial building." *Id.* at ¶ 8. He knew that "he had no appointments that afternoon and [that] the only tenant [in Mozzochi's building] at that time also was closed on Mondays." Mozzochi approached the car, tapped on the window, and "asked the driver her reason for being there." *Id.* The operator of the vehicle explained that she was there to visit the owner of the store that was closed that day. *Id.* Mozzochi explained that the store was closed on Mondays and then "went about his business." The store owner "[a]pparently" later reported the interaction to the Glastonbury Police, alleging that Mozzochi had been "'rude'" to the woman in the car, because a Glastonbury Police officer called Mozzochi about the incident and "interrogated him about his alleged 'rudeness' to the driver of the vehicle." *Id.*

These three incidents, Mozzochi concludes, are "the most recent aspect of a longstanding pattern of disparate treatment of the plaintiff by the defendant." *Id.* at ¶ 9.

The plaintiff's complaint also alleges a series of "historic" events, ECF No. 25 at 2, dating back to 1990 that Mozzochi concedes arose outside the statute of limitations but nonetheless provides as "background evidence" in support of his equal protection claim. ECF No. 25 at 2. These events are as follows:

- On May 7, 1990, Mozzochi "received an anonymous letter containing copies of some of his correspondence with the Glastonbury Police Department and stating that the Glastonbury Chief of Police considered the plaintiff to be 'deranged' and therefore had instructed officers in the department to ignore the plaintiff's complaints. The plaintiff requested the State's Attorney, the late John M. Bailey, to investigate the letter. State's Attorney Bailey did so and on September 21, 1990, advised the plaintiff that the letter appeared to have originated in the office of the Glastonbury Town Manager." ECF No. 19 at ¶ 10.
- Mozzochi also alleges that on the following day, May 8, 1990, he "discovered in his driveway a large green box containing two long strips of cardboard in which there were embedded numerous long roofing nails" and reported the discovery to the Glastonbury Police. ECF No. 19 at ¶ 11. After Mozzochi was informed the police had completed their investigation in late June, he requested a copy of the case file about the incident. *Id.* The Chief of Police denied Mozzochi's request for a copy "solely on the ground that the Chief considered the plaintiff's complaint to have been frivolous and because in his opinion the plaintiff had a 'history of unjustified accusations and abusive behavior toward the Glastonbury Police Department.'" *Id.*
- "Also in 1990," Mozzochi alleges, "the Glastonbury Building Inspector, without warning, ordered the plaintiff to install a sprinkler system in the basement of his commercial bilding [*sic*] at 217 Hebron Avenue. [Mozzochi] challenged him by pointing [out] that Hatz [*sic*] Hardware, located nearby on Main Street, was in blatant violation of the smoke detector ordinance in the adjacent housing complex. The Building Inspector had not taken, and refused to take, any action concerning that violation. Subsequently, a fire occurred at the housing complex and several tenants barely escaped death." ECF No. 19 at ¶ 12.
- And on or around January 1, 2000, neighboring business "Katz Hardware expanded in such a way that the sidewalk along the Naubuc Avenue side of the building was constantly blocked with their merchandise and equipment and the vehicles of their customers. The plaintiff complained to the police department about those unlawful activities and Police Chief Sweeney informed the plaintiff that he would ignore all of his

complaints on that subject because he believed that the plaintiff was using the police to harass Katz Hardware." ECF No. 19 at ¶ 13.

- Mozzochi also alleges that sometime in 2010, "one of [his] tenants at 217 Hebron Avenue was assaulted by an inebriated customer of the nearby Diamond Restaurant, but the investigating officer refused to take any action despite the fact that there were several witnesses who provided the officer with the license plate number of the vehicle driven by the assailant." ECF No. 19 at ¶ 14.

- And, more recently, "on or about April 16, 2016, [Mozzochi] was the victim of a hit-and-run driver who struck him while he was jogging." *Id.* at ¶ 15. According to Mozzochi, the driver "was given only a written warning despite the existence of probable cause to believe that he had committed...a Class D Felony." *Id.* Mozzochi further alleges that his subsequent complaints to the police regarding the way the case was handled "have been ignored repeatedly by the Chief of Police and other high Glastonbury officials to the present day." *Id.*

### b. Procedural History

Mozzochi filed the operative complaint in this case on December 11, 2021 seeking injunctive relief, damages, and attorney's fees and costs for an alleged violation of his Fourteenth Amendment rights by the Glastonbury Police Department. *See* ECF No. 19. Defendant Town of Glastonbury moved to dismiss the plaintiff's operative complaint on December 27, 2021. *See* ECF No. 23. Mozzochi filed his memorandum in opposition to the defendant's motion to dismiss on January 3, 2022. *See* ECF No. 25. The Town then filed its reply brief on January 17, 2022. *See* ECF No. 26.

### III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (internal citations omitted). The Court must "accept[] as true all allegations in the complaint

and draw[] all reasonable inferences in favor of the non-moving party." *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011). "Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

## IV.   DISCUSSION

Mozzochi's amended complaint raises a single claim: that he was "deprived and continues to be deprived by the defendant of equal protection of the laws in violation of the Fourteenth Amendment." ECF No. 19 at ¶ 17. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [this Circuit has] long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). Such individuals may establish a violation of the Fourteenth Amendment's equal protection guarantee by satisfying the requirements of either a "class of one" claim or a selective enforcement claim. *Id.* (recognizing both claims).

Mozzochi concedes he is not claiming to be a member of a protected class, ECF No. 25 at 3, and states that he is asserting a violation of the Equal Protection Clause premised on a class-of-one and a selective enforcement theory. ECF No. 25 at 3. Therefore, the Court will consider Mozzochi's allegations under both standards.

To sufficiently allege an equal protection claim premised on a theory of selective enforcement, a plaintiff demonstrate that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir.1992)).  A selective enforcement equal protection claim "requires proof of disparate treatment and impermissible motivation." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005)) (internal quotation marks omitted).

To state an equal protection claim based on a class-of-one theory, a plaintiff must allege that "[he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074, 145 L. Ed. 2d 1060 (2000) (per curiam).

Although the elements of the two theories are similar, there are critical differences between them.  The Second Circuit recently explained the difference between the two theories as follows:

> While both types of Equal Protection claims require a showing that the plaintiff was treated differently from another similarly situated comparator, they differ in at least two key respects.  First, unlike a malice-based [selective enforcement] claim, [a class-of-one] claim does not require proof of a defendant's subjective ill will towards a plaintiff. Instead, a plaintiff can prevail on [a class-of-one] claim on the basis of similarity alone. However, the similarity standard for [a class-of-one] claim is more stringent than the standard for a [selective enforcement] claim. While [a class-of-one claim] requires an "extremely high" degree of similarity between a plaintiff and comparator, [a selective enforcement claim] merely requires a "reasonably close resemblance" between a plaintiff's and comparator's circumstances.

*Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019).

A plaintiff arguing a class-of-one theory must establish that (1) "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy;" and that (2) "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 60 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir.2006)) (internal quotation marks omitted).

The analysis for each theory differs as to the level of similarity a plaintiff must allege between himself or herself and a comparator, and as to whether a plaintiff must make a showing of malice, but both theories require evidence of differential treatment. *See, e.g.*, *Presnick v. Town of Orange*, 152 F. Supp. 2d 215, 224 (D. Conn. 2001) ("Even assuming that these allegations of malice were sufficiently specific to create a disputed issue of material fact as to whether the defendants acted maliciously…defendants would be entitled to summary judgment because [the plaintiff] has failed to show that he was treated differently from anyone else.").

## A.  *Differential Treatment*

Mozzochi contends that the three events that fall within the statute of limitations "illustrate dramatically disparate ways in which minor police complaints by the plaintiff were handled by the GPD in contrast to the ways comparable complaints against the plaintiff were handled."  ECF 25 at 2.  In addition, Mozzochi alleges that the conduct of the Glastonbury Police Department "demonstrates that for a long time the plaintiff has been, and continues to be, treated differently from all other residents of the Town of Glastonbury who have interactions with the Glastonbury Police Department, that such disparate treatment is irrational, and that it is

8

motivated by malice." ECF No. 19 at ¶ 16. In response, the Town of Glastonbury argues that "the key element that is missing from the Plaintiff's complaint, under either [a class-of-one or a selective enforcement] theory, is the identification of any comparators." ECF No. 26 at 3. Without an adequately alleged similarly situated comparator, the Town contends, Mozzochi's claim must fail. *See* ECF No. 23-1 at 11-13.

Whether individuals are similarly situated is a question of fact ordinarily best suited for a jury. *See, e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing cases). Both parties acknowledge that this is generally the case. *See* ECF No. 23-1; ECF No. 25 at 3. Although "[t]his rule is not absolute," *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 57 (2d Cir. 2016) (internal quotation marks omitted), and there may be cases where a failure to allege any comparators warrants granting a motion to dismiss, this is not such a case. The amended complaint points to comparators who were, like Mozzochi, the target of complaints to the Glastonbury Police Department about mostly minor infractions. At the pleadings stage, that is enough to allege that the comparators were similarly situated. The Court turns next to the question of differential treatment.

Here, the Court first finds that the allegations concerning the March 2020 incident, in which the Glastonbury Police had a single telephonic conversation with Mozzochi after a complaint made by a store owner regarding his interaction with a woman parked near the store, do not add any support to his discrimination claim. Mozzochi contends that the Glastonbury Police's behavior during the March 2020 incident "illustrates the different standards applied by the Glastonbury Police Department when handling complaints *against* the plaintiff in comparison with the manner the department handles complaints made *by* the plaintiff." Amended Complaint, ECF No. 19 at 4 ¶ 8 (emphasis in original). Aside from this conclusory

9

statement, Mozzochi alleges no additional facts to support the notion that the Glastonbury Police investigated the March 2020 complaint any differently than his complaint regarding the December 2020 incident.  As with the December 2020 incident, the Glastonbury Police Department, in investigating the March 2020 complaint, initiated a telephone conversation with the target of the complaint on behalf of the complainant.  In both cases, the Glastonbury Police allegedly took no additional action in furtherance of their investigation.  The Court cannot glean a single material difference in treatment between these events as Mozzochi has alleged them. Even taking all the facts as to these two incidents as true and drawing all reasonable inferences in his favor, the Court finds that Mozzochi has failed to allege any facts about the March 2020 complaint suggesting that he was treated differently from others similarly situated.  *See Green Party of State of New York v. Weiner*, 216 F. Supp. 2d 176, 188 (S.D.N.Y. 2002) ("It is axiomatic that the Equal Protection clause prohibits only 'invidious' discrimination, and does not call into question 'every minor difference in the application of laws to different groups.'").

Mozzochi's allegations about the June 29, 2019 complaint, however, do permit a reasonable inference of differential treatment.  Mozzochi alleges that the Glastonbury Police's response to the June 2019 complaint lodged against him by a tenant of his building differed from their handling of Mozzochi's own January 21, 2021 complaint in the manner in which they contacted and questioned the targets of each complaint.  According to the allegations, an officer called Eversource to investigate Mozzochi's complaint, while Mozzochi received an in-person visit from an officer in response to the June 2019 complaint made by the tenant.  ECF No. 19 at ¶¶ 5-6.  Mozzochi further alleges that he was interrupted at work and harassed by Officer Hemingway for twenty minutes in connection with the investigation of the June 2019 complaint "despite [his] repeated demands that [the officer] leave." ECF No. 19 at ¶ 6.  Mozzochi's

complaint is silent as to the GPD's treatment of the Eversource representative in its investigation of Mozzochi's complaint and as to what was said during that phone call, but the Court must draw the reasonable inference that this was an ordinary phone call free from harassment or physical intimidation.  Therefore, although Mozzochi's allegations are somewhat thin, the Court finds that these allegations, taken together, plausibly allege differential treatment in a manner sufficient to state a claim for "class-of-one" discrimination or selective enforcement.  Further, the allegation that Mozzochi was "harass[ed] with accusations and interrogation despite...repeated demands" that the officer leave, ECF No. 19 at ¶ 6, while the target of *his* complaint received an ordinary phone call from an officer, plausibly support Mozzochi's claim that the Town's differential treatment was irrational or motivated by malice.

### B.  Municipal Liability

Although the Court has found that Mozzochi has plausibly alleged a Fourteenth Amendment violation, the analysis does not end there.  "[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).  "To hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (alteration omitted).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Here, Mozzochi argues that the "acts and omissions" alleged in his complaint "persisted for so many years that they became by virtue thereof the *de facto* policy of [the Town]."  ECF No. 19 at ¶ 4.  Accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor, the Court finds that the facts in Mozzochi's complaint outlining a pattern of disparate treatment and malice against him on the part of the Glastonbury Police Department and other Town offices—from the allegation concerning a letter that originated in the "office of the Glastonbury Town Manager" and identified the plaintiff as "deranged," ECF No. 19 at ¶ 10, to the April 16, 2016 hit-and-run incident, ECF No. 19 at ¶ 15, to the incidents that took place and were investigated between 2019 and 2021, ECF No. 19 at ¶¶ 5-8—"tend[] to support, at least circumstantially, an inference that…a municipal policy or custom exists." *Santos v. New York City*, 847 F.Supp.2d 573, 576 (S.D.N.Y. 2012).  Therefore, the Town's motion to dismiss Mozzochi's equal protection claim must be denied.

## V.     CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss the plaintiff's amended complaint [ECF No. 23] is DENIED.


IT IS SO ORDERED.


_____/s/_____

Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut

                August 15, 2022

12